**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| BARBARA C. DOUTEL, | : | |
|     PLAINTIFF, | : | |
| | : | CIVIL ACTION NO. |
|     v. | : | 3:11-CV-01164 (VLB) |
| | : | |
| CITY OF NORWALK, HARRY W. | : | |
| RILLING, THOMAS MATERRA, | : | |
| JAMES WALSH, JARED ZWICKLER, | : | |
| WILLIAM CURWEN, JEREMY | : | |
| SALLEY, KENNETH FLUDD, and | : | |
| FRANK REDA, | : | |
|     DEFENDANTS. | : | July 3, 2013 |

<u>MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT / MOTION TO DISMISS
[Dkts. 26, 27]</u>

**I.**     <u>**Introduction**</u>

The Plaintiff, Barbara C. Doutel ("Plaintiff" or "Mrs. Doutel"), brings this

action against the Defendants City of Norwalk, Chief of the Norwalk Police

Department Harry W. Rilling, and police officers Thomas Materra, James Walsh,

Jared Zwickler, William Curwen, Jeremy Salley, Kenneth Fludd, and Frank Reda,

in recompense for alleged deprivations of Plaintiff's constitutional rights

stemming from a search of Plaintiff's home in her absence and a seizure of

firearms allegedly owned by her.  Plaintiff alleges a violation of her right to be free

from unreasonable search and seizure pursuant to the 4th Amendment, a

deprivation of her right to procedural due process in contravention of the 14th

Amendment, municipal liability against the City based on a theory of failure to

train, and a violation of Plaintiff's right to keep and bear arms under both the 2nd

1

Amendment to the U.S. Constitution and Article 1, section 15 of the Connecticut constitution.  Currently pending before the Court is Defendants' Motion to Dismiss and Motion for Summary Judgment.  For the reasons that follow, the Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part, and the Defendants' Motion to Dismiss is GRANTED.

## II.   Factual Background

As an initial matter, the Court notes that Fed. R. Civ. P. 56(c)(1) requires that

> [a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact.

Rules 56(c)(2) and (c)(3) declare that a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence" and that "[t]he court need consider only the cited materials, but it may consider other materials in the record."  Additionally, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . [or] grant summary judgment if the motion and supporting materials – including the facts considered disputed – show that the movant is entitled to it . . ."  Fed. R. Civ. P. 56(e)(2), (e)(3).

2

Further, this district's Local Rule 56 requires that a party filing a summary judgment motion annex a "concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)(1).  "All material facts set forth in said statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party. . ."  *Id.*  Local Rule 56(a)(2) requires that the papers opposing a motion for summary judgment shall include a document which states "whether each of the facts asserted by the moving party is admitted or denied" and must also include a "list of each issue of material fact as to which it is contended there is a genuine issue to be tried."  Each statement of material fact in a Local Rule 56(a)(1) or Local Rule 56(a)(2) statement, as well as each denial in a summary judgment opponent's Local Rule 56(a)(2) statement, "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  D. Conn. L. Civ. R. 56(a)(3).

Here, Defendants have submitted a Local Rule 56(a)(1) statement with specific citations to evidence in the record.  Plaintiff, however, has failed to include any citation to evidence in the record in her 56(a)(2) denials of facts alleged to be undisputed by the Defendants.  In her own list of allegedly disputed facts, Plaintiff has improperly cited to entire exhibits – some of which are full deposition transcripts – rather than to specific portions thereof.

Thus, the Court will consider the facts presented in the Defendants' 56(a)(1) statement and the admissible evidence to which they cite to be controlling where adopted by Plaintiff, or where Plaintiff has objected to such facts but has failed to support her objection with any admissible evidence in the record and where the record itself does not support Plaintiff's denials. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (holding that Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"). Where a fact has been adequately disputed or is supported by the record in this case, the Court has noted such.

In February 2011 Duane Doutel, Plaintiff Barbara Doutel's husband, had been a patient at the office of Dr. Igal Staw, who was his primary care physician, for approximately eight years. [Dkt. 28, Ds' 56(a)(1) Stmt. ¶1; Dkt. 57-3, Duane Doutel Depo. p. 47]. On February 7, 2011 Mr. Doutel attended an appointment with Dr. Staw for a pre-operative physical examination and blood testing, some of which had been requested by his surgeon, Dr. Altman, prior to scheduled rotator cuff surgery. [Dkt. 28, Ds' 56(a)(1) Stmt. ¶2; Dkts. 57-3, 57-4, Duane Doutel Depo. pp. 48, 50, 53, 70].

At the time of this appointment with Dr. Staw Duane Doutel possessed a permit issued by the state of Connecticut allowing him to carry a handgun. [Dkt. 57-4, Duane Doutel Depo. p. 60; Dkt. 57-9, Zwickler Depo. p. 56]. On February 7, 2011, Mr. Doutel carried to his appointment a loaded handgun in a holster on his

4

hip and inside the waistband of his pants.  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶6; Dkt. 57-4, Duane Doutel Depo. p. 57].  In the examination room, Mr. Doutel disrobed partially for his physical exam, placed his handgun on the counter, and placed the brimmed hat he had been wearing over the gun, completely encompassing the weapon.  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶9; Dkt. 57-4, Duane Doutel Depo. p. 57, 58].  According to Mr. Doutel, he had placed his pistol and hat in similar fashion on prior visits to Dr. Staw's office.  [Dkt. 57-4, Duane Doutel Depo. p. 58].  When Dr. Staw entered the room he casually moved Mr. Doutel's brimmed hat and saw the gun in its holster under the hat and on top of Doutel's pile of clothing.  [*Id.* at 59; Dkt. 28, Ds' 56(a)(1) Stmt. ¶10].  Doutel testified that Dr. Staw then said, "Oh, what's this?" to which Doutel replied "Well, you've seen this before. . . I am permitted to carry this and it is – I carry it for self-defense."  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶¶12, 14; Dkt. 57-4, Duane Doutel Depo. p. 60].  Mr. Doutel and Dr. Staw have both testified that, on one or more prior occasions, Dr. Staw was aware that Mr. Doutel had carried a handgun into his office.  [Dkt. 57-4, Duane Doutel Depo. p. 60; Dkt. 36-1, State. v. Doutel transcript 8/22/11, at pp. 7-8].

On February 9, 2011, Mr. Doutel received a call from Dr. Staw's office notifying him that the results of some of the blood tests performed at his appointment on February 7 were "out of bounds" and needed to be repeated.  [Dkt. 57-4, Duane Doutel Depo. p. 53].  Specifically, Doutel was informed that he needed to repeat his hemoglobin A1C and cholesterol tests, which had not been ordered by Dr. Altman, but were routine tests that Dr. Staw had drawn allegedly without first notifying Duane Doutel and which related to Doutel's diabetic

condition.  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶17; Dkts. 57-3, 57-4, Duane Doutel Depo. pp. 48-50, 53].  On this call, Mr. Doutel became annoyed and requested that Dr. Staw call him at his home to discuss this request.  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶17; Dkt. 57-4, Duane Doutel Depo. p. 54].  Dr. Staw returned Doutel's call to discuss his test results, at which point Doutel informed Dr. Staw that he no longer wished to remain a patient at Staw's practice and instructed that his medical records be sent to Dr. Altman.  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶18; Dkt. 57-4, Duane Doutel Depo. p. 54].

On the evening of February 15, 2011, Mr. Doutel called Dr. Staw's office after hours and left the following message on the office's voicemail:

> Hi, this is Duane Doutel, a former patient of Dr. Staw's. Uh, I paid at my last visit for an EKG and a CBC which were pre-op and they have not been forwarded, despite several requests, to the surgeon.  He *will* provide those because I paid for them up front.  I want them forwarded. If I haven't heard within forty-eight hours that those results have been forwarded to Dr. Altman, I will be walking into the office, and it will *not* be pretty, do you understand me?  I paid for those up front.  You *will* provide them.  I *will* see to it that a valid A1C is done, not the botched one that Dr. Staw ran without fasting. Thank you.

[Dkt. 28, Ds' 56(a)(1) Stmt. ¶19; Dkt. 40-4, D. Doutel voice message 2/15/11 (manually filed as audio recording)].

At about 9:56 the following morning, February 16, 2011, Sandy Staw – Dr. Staw's wife and office employee – called the Norwalk Police Department and reported to the dispatcher that a "dissatisfied" patient had called and left a "very threatening message."  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶20; Dkt. 40-5, Sandy Staw

**6**

police call (manually filed as audio recording)].  Mrs. Staw enumerated that "[t]his person, whenever he comes in, he comes in with a gun, and he always puts it down on the counter and covers it with his hats," and further advised the Police Department that "[w]e feel threatened."  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶20; Dkt. 40-5, Sandy Staw police call (manually filed as audio recording)].

Officer Jared Zwickler was dispatched to Dr. Staw's office shortly after, where he listened to the allegedly threatening message and interviewed Dr. Staw and his staff.  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶21; Dkt. 40-6, Computer Aided Dispatch "CAD" Reports].  Sandy Staw and Dr. Igal Staw both gave Zwickler sworn statements around 11:20 AM.  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶22; Dkt. 40-1, Igal Staw Stmnt.; Dkt. 40-2, Sandy Staw Stmnt.].  In his sworn statement, Dr. Staw noted Mr. Doutel's displeasure with the test results performed and relayed that

> [i]n the last few visits, Mr. Doutel came into the office with a revolver.  In the last visit he placed his hat on the counter in the exam room, with the gun under his hat.  I asked him about the hat (just making conversation), and he told me his gun was underneath.  I saw the gun after moving the hat a few inches.  He told me that he always carries a gun, that he has a license to do so, that he sleeps with a gun under his pillow, and that the police is [sic] under no obligation to protect him.

[Dkt. 40-1, Igal Staw Stmnt.; Dkt. 28, Ds' 56(a)(1) Stmt. ¶23].  Dr. Staw noted further: "Having heard the message, and knowing that Mr. Doutel carries a gun, and also knowing that he becomes easily excited, I now feel threatened."  [*Id.*].  Sandy Staw swore in her statement that "[d]uring the message [Mr. Doutel] did sound irate.  Mr. Doutel is known to carry a gun into the office during his visits + place it on a table under his hat.  He typically alerts the physician that he has a

firearm + has a permit to carry it." [Dkt. 40-2, Sandy Staw Stmnt.; Dkt. 28, Ds'
56(a)(1) Stmt. ¶24]. She further noted

> He has an excitable personality, extremely opinionated +
> politically, extremely one-sided.
>
> His voice mail left me uncomfortable regarding the
> safety of the entire office staff because he carries a
> firearm + seems unstable.

[Dkt. 40-2, Sandy Staw Stmnt.; Dkt. 28, Ds' 56(a)(1) Stmt. ¶24].

    Officer Zwickler also recorded statements made by Dr. Staw and his staff in
his Case/Incident Report filed on February 16, 2011. [Dkt. 40-3, Zwickler
Case/Incident Report]. Janine Roy, another office employee, reported that Mr.
Doutel is "easily excited and often voices strong opinions on politics." [Dkt. 40-3,
Zwickler Case/Incident Report p.2]. Roy also stated that she "considers [Doutel]
to be a right-wing individual" and that "she fears for her safety based on Doutel's
unstable, irritable demeanor, and his threatening voicemail." [*Id.*]. Sandy Staw
told Zwickler that Mr. Doutel "caused her alarm, and she fears for her safety as
well as for the safety of the other office workers." [*Id.*]. Dr. Staw reported to
Zwickler that Mr. Doutel's voice mail "makes him fear for his safety and for the
safety of his office workers," and that "based on Doutel's unstable demeanor and
his unusual display of firearms, [Dr. Staw] took his voicemail as a serious threat."
[Dkt. 40-3, Zwickler Case/Incident Report p.3]. Dr. Staw further advised Officer
Zwickler that he would apply for a restraining order to protect himself from Mr.
Doutel. [*Id.*]. Moreover, upon reviewing Mr. Doutel's voice mail message, Officer
Zwickler recorded in his Report that "Doutel sounds extremely angry and is
almost yelling through the phone." [Dkt. 40-3, Zwickler Case/Incident Report p.2].

After speaking with Dr. Staw and his staff, Officer Zwickler returned to police headquarters and "had the dispatchers run [Duane Doutel] for a pistol permit." [Dkt. 57-8, Zwickler Depo. pp. 47-48]. The dispatcher reported that Duane Doutel had a valid pistol permit with several guns registered to him. [Dkt. 57-9, Zwickler Depo. p. 56; Dkt. 43-1, Hrng. Trans. State v. Doutel 7/27/11 p.71]. Zwickler spoke with his supervisor – Sergeant (now Lieutenant) Walsh – who advised him to contact Mr. Doutel in order for him to come to the police station to be arrested for the misdemeanor charge of threatening. [Dkt. 29-1, Walsh Aff. ¶9]. Zwickler contacted Mr. Doutel by telephone around 12:20 PM and asked Doutel to come to Norwalk Police Headquarters to discuss the voice mail incident. [Dkt. 28, Ds' 56(a)(1) Stmt. ¶25; Dkt. 57-4, Duane Doutel Depo. pp. 68, 72]. Mr. Doutel declined. [Dkt. 28, Ds' 56(a)(1) Stmt. ¶26; Dkt. 57-4, Duane Doutel Depo. p. 68; Dkt. 40-3, Zwickler Case/Incident Report p.3]. Officer Zwickler proceeded to ask Mr. Doutel if he could come to Doutel's home to discuss the matter and, at first, Mr. Doutel agreed. [Dkt. 57-4, Duane Doutel Depo. p. 68; Dkt. 40-3, Zwickler Case/Incident Report p.3]. Mr. Doutel changed his mind, however, and advised Officer Zwickler not to come to his home without a warrant for his arrest. [Dkt. 57-4, Duane Doutel Depo. p. 68; Dkt. 40-3, Zwickler Case/Incident Report p.3; Dkt. 28, Ds' 56(a)(1) Stmt. ¶27].

Officer Zwickler reported that Mr. Doutel was "extremely irate on the telephone" and that upon changing his mind about allowing Zwickler to speak with him at his home, Mr. Doutel "became irritated and began yelling at [him] over the phone." [Dkt. 40-3, Zwickler Case/Incident Report p.3; Dkt. 57-9, Zwickler

Depo. p. 57].  Mr. Doutel has testified that he changed his mind about speaking

with the officer at his residence after Zwickler advised him that he could not be

armed while doing so, at which point Mr. Doutel felt that Officer Zwickler was not

being truthful with him.  [Dkt. 57-4, Duane Doutel Depo. p. 68].  When asked at his

deposition why Mr. Doutel believed Officer Zwickler was not being truthful with

him, Doutel responded by describing his frame of mind, in pertinent part, as

follows:

> My frame of mind was not of a - - I was certainly not in a
> mood to be rousted or messed with.  And then I'm
> getting calls from the cops?  Excuse me.  I've lived 56
> years of my life to that point without ever having been
> involved with police or law enforcement of any kind, and
> for making a phone call and using the phrase, 'It won't
> be pretty,' and then having a doctor imply that he was
> worried I was going to shoot him?  Please.

[Dkt. 57-4, Duane Doutel Depo. p. 56].  Doutel further testified "I wasn't thinking at

the time, oh, [Dr. Staw] thinks I'm going to shoot him, but I was thinking more

along the lines of, he's had the unmitigated gall to call the cops about an irritated

phone call when he, himself, is here at fault."  [*Id.* at p. 70].  "First of all, I didn't

think that I should be hearing from the police at all, and I didn't think that there

was any reason that they should have been interested in anything that was said.

And since nothing was done, and I was the injured party, I didn't feel that I

needed to talk to cops."  [*Id.*].

**10**

At some point, Officer Zwickler consulted with Sergeant Walsh and a decision was made to arrest Mr. Doutel at his home.[1]  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶27; Dkt. 57-9, Zwickler Depo. p. 68; Dkt. 29-1, Walsh Aff. ¶¶9, 10].  The seven defendant members of the Norwalk Police Department – Lieutenant Materra, Sergeant Walsh, and Officers Zwickler, Curwen, Salley, Fludd, and Reda – were then dispatched to Mr. Doutel's home, and they spread out in the home's vicinity. [Dkt. 40-6, CAD Reports p.7; Dkt. 28, Ds' 56(a)(1) Stmt. ¶28].  Around 1:00 PM, Mr. Doutel received another telephone call from the Norwalk Police dispatcher telling him to exit his house wearing no jacket or coat, with his hands held high and nothing in his hands.  [Dkt. 57-4, Duane Doutel Depo. pp. 72, 73; Dkt. 40-6, CAD Reports p.4; Dkt. 40-5, Dispatch Recording (manually filed as audio recording; saved as "Threats Radio Trans 4")].  Doutel complied and exited unarmed through his garage door to the driveway in front of the garage.  [Dkts. 57-4, 57-5, Duane Doutel Depo. pp. 73-75, 79].

Mr. Doutel and the officers disagree as to what exactly transpired after he exited his home through the garage.  Mr. Doutel has testified that as he exited his home he saw the seven police officers surrounding the home in front of his so he called out to them "wrong place."  [Dkt. 57-4, Duane Doutel Depo. p. 75]. According to Mr. Doutel, the police officers then turned around, pointed their guns at him, and two to three of them approached him, frisked him, and handcuffed him while his back was turned toward the officers as they had

---

[1] It is unclear whether Officer Zwickler placed one or two calls to Mr. Doutel – the second occurring after Zwickler spoke with Sergeant Walsh a second time and advised him that Mr. Doutel had refused to come to the police station.

instructed.  [Dkt. 57-4, Duane Doutel Depo. pp.75-76].  All seven officers
eventually surrounded him.  [*Id.* at p. 76].  Doutel testified that he and the officers
then

> stood around on the driveway, none of them really
> saying anything.  And then all of a sudden two or three
> of them turned around, walked into my house.  And then
> I think I asked somebody, 'What do they think they're
> doing?'
>
> 'Oh, I have to clear the premises.'
>
> Okay.  I then was shortly thereafter walked into my own
> home in handcuffs to find that they had already begun
> searching the house.  They had seized my wife's rifles,
> they had them sitting on the bed in the bedroom. . . .
> And I'm observing a cop with the Mossberg [12 gauge
> single barrel shotgun], my Mossberg . . .

[Dkt. 57-4, Duane Doutel Depo. p. 77].  Mr. Doutel affirmed that none of the
officers engaged in any conversation with him as they were standing in the
driveway.  [Dkts. 57-4, 57-5, Duane Doutel Depo. pp. 78-79].  He also attested that
the officers did not ask his permission to enter his home.  [Dkt. 57-5, Doutel Depo.
p. 80].  When asked at deposition if he had voiced any opposition to the officers
entering his home, Doutel responded "No.  I believe I told them not to come
without a warrant on the phone.  And between his arrival and my telling him on
the phone not to come without a warrant, I don't believe my position changed."
[*Id.*].  Doutel further clarified that he believed it would have been pointless to
voice such a complaint.  [*Id.*].  While Mr. Doutel testified that he did not recall if,
prior to entering his home, the officers asked him if he had any weapons in the

house, he testified that he did not volunteer this information.  [Dkt. 57-5, Duane
Doutel Depo. p. 79].

Doutel testified that the officers then led him handcuffed to his home and

> they walked me around my house.  They said "Where" -
> - they're looking at a slip of paper and someone - -
> apparently a list of guns.  And they're walking me
> around the house telling me, "Where are these?"
>
> And, let's see.  I'm already being searched without a
> warrant.  I'm cuffed.  I really - - there's not much I could
> do.  So rather than allow them to tear my house apart,
> which I have no doubt they would have done certainly,
> when asked about them I told them where they were.

[*Id.* at pp. 80-81].  According to Mr. Doutel's deposition testimony, before leading
him back into his home the officers had also already entered into the two bedside
tables in his and his wife's bedroom and seized one of his handguns.  [*Id.* at pp.
82-83].  Mr. Doutel then informed the officers where the remaining guns were
located, including the "only one they didn't know about," his wife's Sig Sauer
P232 handgun which was, at that time, located in the living room.  [*Id.* at pp. 81-
82].

Although both the Plaintiff and the Defendants agree that Officers Curwen,
Fludd and Zwickler entered Mr. Doutel's home, the officers recall the events
surrounding the entry somewhat differently; Defendants contend that the officers'
entry into the Doutel home and the seizure of the Doutels' firearms were
consensual.  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶78; Dkt. 57-1, P's 56(a)(2) Stmt. ¶78].  The
four officers seemingly involved in the entry and search of Mr. Doutel's home
have submitted affidavits in support of their motion for summary judgment.

13

Officer Fludd has affirmed that upon arrival at the Doutel home, he approached Mr. Doutel outside, assured that he was not armed, and placed Mr. Doutel in handcuffs, and then placed Mr. Doutel in the back of a police cruiser with the door open.  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶30; Dkt. 28-3, Fludd Aff. ¶10].  Officer Fludd reported that Mr. Doutel was highly compliant and did not resist at all.  [Dkt. 28-3, Fludd Aff. ¶9].  Fludd further recounted that "Mr. Doutel was asked whether or not he would help us locate the weapons in his house for the purpose of removing them," to which Mr. Doutel "immediately and without protest or hesitation got out of the police cruiser and walked into his house," an account that Mr. Doutel disputes.[2]  [*Id.* at ¶13].  Officer Fludd claims to have followed Mr. Doutel into the home, where Mr. Doutel "indicated to [the officers] where the weapons were hidden."  [*Id.* at ¶¶13, 14].  Fludd claims that at all times Mr. Doutel "had a very pleasant and cooperative demeanor and was very helpful," and at no time did Mr. Doutel protest the officers' presence in his home or protest the removal of the firearms.  [*Id.* at ¶¶15, 16].

Defendant Officer Curwen, who was at the scene, submitted an affidavit in which he reported observing Mr. Doutel have a conversation with Officer Fludd. [Dkt. 28-2, Curwen Aff. ¶12].  Curwen claims that "[w]hen asked about the presence of weapons in his home, Mr. Doutel immediately led us to the front door of his house and entered the home with us," where he then "commenced

---

[2] Fludd does not specify which officer asked Mr. Doutel this or any other question.

informing us where all the weapons in the house were located."[3]  [*Id.* at ¶¶13, 16]. Curwen recounts that some of the weapons were in plain view and some were located within furniture or in another room to which Doutel directed the officers. [*Id.* at ¶17].  Like Fludd, Curwen claims that at no point did Mr. Doutel refuse to answer any questions about the presence of firearms in his home, refuse to cooperate with the officers or protest against the removal of the firearms, or protest or inform the officers that any of the weapons either did not belong to him or belonged to his wife.  [*Id.* at ¶¶14, 15, 18].

Sergeant (now Lieutenant) Walsh affirmed in a similar affidavit that he and Officer Fludd discussed a plan to place Mr. Doutel's guns in safekeeping, Mr. Doutel was informed of this plan, and he "did not object in any manner by way of words or deeds."[4]  [Dkt. 29-1, Walsh Aff. ¶¶22, 23, 25].  Walsh claimed that when Mr. Doutel was asked whether there were any weapons in the home, he responded in the affirmative, began to walk toward his house and entered his home accompanied by Officers Fludd, Curwen, and Zwickler.[5]  [*Id.* at ¶¶24, 26, 27]. Although Sergeant Walsh was not present in the Doutel home as it was searched, Walsh claims that Mr. Doutel assisted the officers in locating the weapons inside his home and at no time did Mr. Doutel protest that any weapon belonged to his wife, or voice any objection to placing the firearms in safekeeping.  [Dkt. 29-1, Walsh Aff. ¶¶35, 36, 37].

---

[3] Officer Curwen does not specify precisely who asked Mr. Doutel this or any other question.

[4] Walsh does not explain how Mr. Doutel came to be informed of this plan.

[5] The Court notes that Sergeant (now Lieutenant) Walsh has not indicated who asked Mr. Doutel whether there were firearms in his home, and further notes that Walsh was not present in the Doutel home as it was searched.

Finally, Officer Zwickler affirms that he also observed Mr. Doutel speaking with Officer Fludd, although Zwickler was not a direct participant in their conversations.  [Dkt. 32, Zwickler Aff. ¶18].  Zwickler stated in his affidavit that he observed Mr. Doutel "leading the police officers into his house;" because Zwickler was the responding officer to the incident, he too entered the residence.  [*Id.* at ¶20].  Officers Fludd, Curwen, and Zwickler entered Mr. Doutel's home with him.  [*Id.* at ¶21].  Zwickler attested that, in his presence, Mr. Doutel directed the officers to the location of the weapons, some of which were in the open and others of which were hidden.  [*Id.* at ¶21].  Zwickler further claims that at no time did Mr. Doutel refuse to cooperate in the search for the firearms, at no time did he indicate that any weapon belonged to his wife, and at no time did he protest the officers' entry into his home.  [*Id.* at ¶¶22, 24].  During his deposition, though, Officer Zwickler admitted that, prior to entering Duane Doutel's home, he was "advised by other officers that we'd be going to his house and retrieve the firearms."  [Dkt. 57-9, Zwickler Depo. p. 69].  Zwickler also noted during deposition that he was not aware if Mr. Doutel had objected or consented to the officers entering his home, as Zwickler was not present for any conversation between the officers and Doutel outside of the home.  [*Id.* at p. 69].  Lastly, Zwickler testified at deposition that prior to Doutel's arrest, he had not determined whether anyone other than Duane Doutel lived in the Doutel residence, or whether any such person held a state pistol permit.  [Dkt. 57-10, Zwickler Depo. p. 83].  Zwickler learned after Doutel's arrest that Doutel shared the residence with his wife.  [*Id.* at pp. 83-84].

Officer Zwickler's Case/Incident Report notes that the following firearms were removed from the Doutel home and taken to the Norwalk Police Department: a Springfield EMP 9mm, a Glock 19 9mm, a Sig Sauer P232 .380, a Sig Sauer P225 9mm, a Mossberg 12 gauge, a Marlin Model 31, and a Winchester rifle with scope. [Dkt. 40-3, Zwickler Case/Incident Report p.1 ]. Zwickler coded these weapons as "E" for evidence in his Report. [*Id.*]. Zwickler has since attested that he mistakenly coded the weapons removed from Doutel's home as "E" for evidence. He claims that he has since become aware that the weapons were not taken by the police as evidence, but rather for safekeeping, and thus claims the coding to have been in error.[6] [Dkt 32, Zwickler Aff. ¶27, 28]. Mr. Doutel was issued a property receipt at headquarters for the six weapons taken from his home and which indicated that "[w]eapons taken for safekeeping will be destroyed if unclaimed after six months." [Dkt. 44-3 Property Receipt; Dkt. 28, Ds' 56(a)(1) Stmt. ¶38]. Duane Doutel testified that in February 2011 he owned three weapons: a Springfield EMP 9 handgun (9mm), a Glock 19 handgun (9mm), and a Mossberg Model 500 (12 gauge) single barrel shotgun. [Dkts. 57-2, 57-3, Duane Doutel Depo. pp. 12-19, 30]. According to Mr. Doutel, at the time of the incident Barbara Doutel owned a Winchester rifle, a Marlin Bolt-Action .22 rifle, a SIG

---

[6] At deposition, Zwickler attested that he did not recall whether it was his decision to code the firearms as "E" or whether he was told to do so. [Dkt. 57-7, Zwickler Depo. p. 72]. In response to why he did not code the firearms as "seized," Zwickler responded "[l]ike now, looking at it, it probably would have been a better option to put down they were seized or recovered or something like that; or unknown." [*Id.* at p. 65]. At a hearing before the state superior court on July 27, 2011, though, Officer Zwickler testified that he entered Doutel's home "to obtain evidence or firearms," and further explained that "the firearms related to the threatening charge." [Dkt. 41--44, 7/27/11 hearing transcript, State v. Doutel, pp.76, 82].

Sauer P232 handgun, and a SIG Sauer P6 handgun.  [Dkt. 57-2, Duane Doutel Depo. pp. 19-21, 24, 26].

Mr. Doutel was transported to Norwalk Police headquarters where he was processed and charged with threatening in the second degree, a misdemeanor offense, in violation of Conn. Gen. Stat. § 53a-62.  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶¶34, 39; Dkt. 40-3, Zwickler Case/Incident Report p.1].  Mr. Doutel posted bond in the amount of $2,500 and was released from the station several hours later.  [Dkt. 57-5, Duane Doutel Depo. pp. 83, 85; Dkt. 40-3, Zwickler Case/Incident Report p.1].  The Department of Public Services revoked Duane Doutel's gun permit in late February or early March 2011, approximately two weeks after the incident in question.  [Dkt. 57-3, Duane Doutel Depo. p. 33; Dkt. 28, Ds' 56(a)(1) Stmt. ¶43].

During the pendency of the criminal proceedings against him, on April 22, 2011 Duane Doutel filed in Connecticut Superior Court a Motion for Return of Seized Property, requesting the return to *Mr. Doutel* of all property listed in Officer Zwickler's Case/Incident Report.  [Dkt. 46-3, Duane Doutel 4/22/11 Motion for Return of Seized Property; Dkt. 28, Ds' 56(a)(1) Stmt. ¶61].  Nowhere in the Motion did Mr. Doutel mention that any of the seized firearms belonged or were registered to his wife, Barbara Doutel.

On May 20, 2011 Mr. Doutel appeared in Connecticut Superior Court before Judge Hudock.  Through counsel, Mr. Doutel noted his previously filed Motion for Return of Seized Property.  The State moved to modify Mr. Doutel's condition of release to preclude him from possessing any weapons.  [Dkt. 45-2, Hrng. Trans.

State v. Doutel 5/20/11 pp.1-2; Dkt. 28, Ds' 56(a)(1) Stmt. ¶50].  In support of its motion, the State prosecutor noted that it had come to the State's attention that Mr. Doutel had applied for and been subsequently denied a temporary pistol permit after the revocation of his previously issued pistol permit, thus prompting the State to request a modification of Mr. Doutel's conditions of release.  [Dkt. 45-2, Hrng. Trans. State v. Doutel 5/20/11 pp.2, 6; Dkt. 28, Ds' 56(a)(1) Stmt. ¶50].  The court granted the motion and entered a temporary order that Mr. Doutel not possess any weapons or apply for a pistol permit due to the pending charge of threatening in the second degree.  [Dkt. 45-2, Hrng. Trans. State v. Doutel 5/20/11 pp. 8,10; Dkt. 28, Ds' 56(a)(1) Stmt. ¶52].  The court did not rule on Mr. Doutel's motion for return of seized property.  On May 23, 2011 Mr. Doutel filed a motion to vacate the court's May 20 temporary order.  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶53; Dkt. 45-3, Duane Doutel 5/23/11 Motion to Vacate Order].

Around May 15, 2011, prior to the May 20 hearing at which Mr. Doutel's conditions of bond were revised, prohibiting him from possessing a gun or from applying for a temporary permit to carry a gun, counsel for Mr. and Mrs. Doutel authored and addressed two letters to Chief of Police Harry Rilling demanding the return of Mr. and Mrs. Doutel's respective firearms.  [Dkts. 47-4, 47-5, Letters re Return of Seized Property, 5/15/11; Dkt. 28, Ds' 56(a)(1) Stmt. ¶63].  Defendants contend that these two letters were not received by the Norwalk Police Department until May 23, 2011, after superior court Judge Hudock had ordered that Mr. Doutel not possess any firearms; both letters have been stamped

"RECEIVED MAY 23 2011 Ofs of the Chief."  [[Dkts. 47-4, 47-5, Letters re Return of Seized Property, 5/15/11]; Dkt. 28, Ds' 56(a)(1) Stmt. ¶64].

Two months later, on July 5, 2011 the State altered the charges against Mr. Doutel and filed a substituted information charging Mr. Doutel with harassment in the second degree in violation of Conn. Gen. Stat. § 53a-183; the State also requested the issuance of an order of protection to benefit Sandy Staw.  [Dkt. 46, Hrng. Trans. State v. Doutel 7/5/11 p. 11; Dkt. 28, Ds' 56(a)(1) Stmt. ¶59].  After reviewing the police report, Judge Maureen Dennis recognized the State's substituted information and entered the requested order of protection, advising Mr. Doutel that he was required to stay 100 yards away from Sandy Staw and, under the law, he could not possess any firearms while a protective order was in place.  [Dkt. 46, Hrng. Trans. State v. Doutel 7/5/11 pp.11-12; Dkt. 28, Ds' 56(a)(1) Stmt. ¶60.  Additionally, Judge Hudock's temporary order remained in place until such time as Mr. Doutel's motion to vacate could be heard.  [Dkt. 46, Hrng. Trans. State v. Doutel 7/5/11 pp. 11-12].

Hearings as to Mr. Doutel's Motion to Vacate the Temporary Order modifying the conditions of Mr. Doutel's release were held before Judge Maureen Dennis on July 27 and August 22, 2011, at which the court heard testimony from Dr. Staw, Sandy Staw, Jeanine Roy, and officers Reda, Salley, and Zwickler.  [Dkts. 41—44, Hrng. Trans. State v. Doutel 7/27/11; Dkts. 36—39, Hrng. Trans. State v. Doutel 8/22/11].  Judge Dennis denied Duane Doutel's Motion to Vacate the Temporary Order by written decision on November 28, 2011.  [Dkt. 45-4, 11/28/11 Memo. of Decision re Motion to Vacate Order; Dkt. 28, Ds' 56(a)(1) Stmt.

¶55].  Judge Dennis noted the testimony presented during the July and August hearings, the police report prepared by Officer Zwickler, the February 15, 2011 voicemail message, as well as the intonation of Duane Doutel's voice on the message.  [Dkt. 45-4, 11/28/11 Memo. of Decision re Motion to Vacate Order].  Judge Dennis concluded that "[c]onsidering the weight of the evidence and the nature and totality of the circumstances in this case, the previous orders of the court, temporarily restricting the defendant's right to bear arms to ensure that the safety of any other person will not be endangered, are not unreasonable."  [*Id.*].

On April 17, 2012 counsel for the City of Norwalk filed with the superior court a Motion for Disposition of Seized Property, seeking the court's intercession in determining the ownership and disposition of weapons allegedly owned by Barbara Doutel.  [Dkt. 46-4, Norwalk Motion for Disposition of Seized Property, 4/17/12; Dkt. 28, Ds' 56(a)(1) Stmt. ¶70].  At a Superior Court proceeding on May 7, 2012 this motion was mentioned on the record but no ruling was issued and no date was set for a hearing on the motion; instead the case was scheduled for a status conference in September 2012.  [Dkt. 47-1, Hrng. Trans. State v. Doutel 5/7/12 p. 11; Dkt. 28, Ds' 56(a)(1) Stmt. ¶71].  In July 2012, at least one month before the scheduled status conference, the State again reduced the charges against Mr. Doutel to Creating a Public Disturbance in violation of Conn. Gen. Stat. § 53a-181a.  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶72].  The case was scheduled to be heard by a magistrate judge on July 30, 2012, at which time the magistrate entered a dismissal of Mr. Doutel's case.  [*Id.* at ¶¶72, 74].

On July 31, 2012, after the conclusion of Mr. Doutel's criminal case, the magistrate judge signed an Order requiring the release of the property held by the Norwalk Police Department.  [Dkt. 47-2, Inventory of Property Seized Without a Search Warrant, and Order of the Court 7/31/12, p.2; Dkt. 28, Ds' 56(a)(1) Stmt. ¶76].  On August 1, 2012 the seized firearms – minus a rifle bag and a plastic rifle case – were returned to Barbara Doutel.  [Dkt. 47-2, Inventory of Property Seized Without a Search Warrant, and Order of the Court 7/31/12, p.2].  The Norwalk Police Department contends (and a subsequent notation on the Inventory Seized Without a Search Warrant form states) that the rifle bag and case were subsequently returned to Duane Doutel on September 24, 2012.  [Dkt. 47-3, Inventory of Property Seized Without a Search Warrant, Return Form, p.2].  The Plaintiff disputes that the rifle bag and case were returned and instead asserts that the Department could not account for the missing property.[7]  [Dkt. 57-1, P's 56(a)(2) Stmt. ¶77].

### III.   Standards of Review

### a. Motion to Dismiss

---

[7] The Plaintiff cites to no evidence in the record that these two items were not returned to Mr. Doutel.  The Plaintiff instead has provided a letter sent to the Chief of the Norwalk Police Department by counsel for Mr. Doutel on August 14, 2012, demanding an investigation and asserting that, upon earlier presentation at the Department to retrieve his property after the disposition of his criminal case, Mr. Doutel was told that his two rifle cases were missing.  [Dkt. 57-25, 8/14/12 Letter to NPD re missing property].  It is unclear to the Court whether the two rifle cases remain missing at the time of this Decision or whether they were found and returned to Mr. Doutel on September 24, 2012 as the Norwalk Police Department records demonstrate.

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sarmiento v. U.S.*, 678 F.3d 147 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations and internal quotations omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

23

possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005)(MRK).

### b. Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)). "If there is any evidence in the

record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

## IV.   Analysis

### a.   Unreasonable Search and Seizure in Violation of the 4th Amendment (Count 1)

Plaintiff Barbara Doutel contends that the search of her home and seizure of her firearms by the seven defendant members of the Norwalk Police

Department incident to the arrest of her husband, Duane Doutel, was unreasonable and conducted without consent, thus contravening the Fourth Amendment.  Defendants counter that they are entitled to summary judgment on Plaintiff's Fourth Amendment claims because the search of the Doutels' home and the seizure of the firearms were conducted with Mr. Doutel's consent and therefore were not unreasonable.  [Dkt. 27-1, Ds' MSJ/MTD Memo. p. 12]. Defendants also argue that they are entitled to qualified immunity for their actions.

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."  U.S. Const. amend. IV.  "The touchstone of the Fourth Amendment is reasonableness.  The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).

"Under the Fourth and Fourteenth Amendments, a warrantless search of a home is unreasonable unless an exception applies, such as a search conducted pursuant to consent."  *Flynn v. James*, 12-663-CV, 2013 WL 709675 (2d Cir. Feb. 28, 2013).  *See also Jimeno*, 500 U.S. at 250-51 ("we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so"); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent"); *United States v. Snype*, 441 F.3d 119, 130 (2d Cir. 2006)

26

("Although warrantless searches of private property are generally presumed to be unreasonable, the law recognizes certain exceptions, for example, when the search is conducted pursuant to the consent of an authorized person.").

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251.  Consent may not be "a mere acquiescence in a show of authority." *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995); *see also Seifert v. Rivera*, 2013 WL 1149934, at *7, --- F. Supp. 2d --- (D. Conn. 2013) (VLB) (same).  Rather, consent "must be voluntary, and voluntariness is determined by the totality of the circumstances." *Flynn*, 2013 WL 709675, at * 1; *see also Schneckloth*, 412 U.S. at 228 ("the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force.  For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.").  Thus, "[t]he Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to [conduct the search that was undertaken]." *Garcia*, 56 F.3d at 423 (quoting *Jimeno*, 500 U.S. at 249).  "[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *Garcia*, 56 F.3d at 423 (internal quotation marks and citation omitted).  "[W]hen . . . the government relies on consent to justify a

warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary." *Snype*, 441 F.3d at 131.

In this case, genuine issues of material fact remain as to whether Mr. Doutel consented to Defendants' entry into his home or to their seizure of the firearms within his residence, thus precluding a grant of summary judgment in favor of Defendants.  Officers Fludd, Zwickler, and Curwen and Sergeant Walsh contend that Mr. Doutel – after being apprised of the officers' plan to take his weapons for "safekeeping" – willingly agreed with this plan and voluntarily and without hesitation led the officers into his home, where he indicated to the officers the locations of the various firearms so that they could be seized.  The officers contend that at no point did Mr. Doutel protest their plan to seize the weapons for safekeeping, protest their entry into his home, refuse to answer any question posed by the officers, object in any manner to the officers' conduct, or protest or inform the officers that any of the weapons either did not belong to him or belonged to his wife.  Mr. Doutel, however, paints a different picture.  He contends that none of the officers engaged in any conversation with him before their entry into his home, when two or three of them then turned around and entered the residence without having asked or gained permission to do so.  Mr. Doutel claims that after the officers entered he was walked into his home, still handcuffed, without his consent.  Upon Doutel's entry, the officers had *already* seized Barbara Doutel's two rifles and Doutel's Mossberg shotgun.  Although Mr. Doutel admits that he voiced no opposition while in the home to the officers' search for and seizure of his weapons, he also contends that he felt he had no

28

choice but to comply with their questions as the officers had already seized several firearms, had entered his and his wife's bedside tables searching for weapons before his entry into the home, he was handcuffed, and he was worried that the officers would "tear [the] house apart" searching had he not provided the weapons' locations.  Additionally, it appears to the Court from Mr. Doutel's deposition testimony that he recalls only having apprised the officers of the location of *one* firearm – his wife's Sig Sauer P232 handgun located in the living room, and not the locations of the remaining six weapons.

Because the sequence of events and the nature and extent of Mr. Doutel's consent is unclear from the record, genuine issues of material fact exist as to whether the search was consensual.  The Court must leave to the jury the task of weighing the credibility of the evidence and determining the facts.  Similarly, a grant of qualified immunity is inappropriate at this stage because the parties' vague and conflicting accounts of what transpired prior to the officers' entry into the Doutel household leave genuine issues of material fact which a jury must resolve.

However, the Court also notes that Plaintiff has asserted her unreasonable search and seizure claim as against all seven officer defendants, although she has presented no evidence in the record as to the involvement of Officers Salley or Reda or Lieutenant Materra.  Indeed, Plaintiff has expressly admitted that "Officer Salley was with Officer Fludd when Duane Doutel was originally approached.  He played no other role in the matter."  [Dkt. 28, Ds' 56(a)(1) Stmt. ¶80; Dkt. 57-1, P's 56(a)(2) Stmt. ¶80].  Officer Salley testified in superior court

that he did not enter the Doutel residence but rather remained in the driveway. [Dkts. 41—44, Hrng. Trans. State v. Doutel 7/27/11 p. 57]. Similarly, Officer Reda testified before the superior court that the actions he took on February 16, 2011 were "[v]ery minimal." When he arrived at the scene, "everything was pretty much under control or completed at that point." [Dkts. 41—44, Hrng. Trans. State v. Doutel 7/27/11 p. 48]. Reda testified that he had gone to the scene because he was "just told to go there and assist" as a member of the emergency services unit; he had no direct contact with Duane Doutel, did not enter Doutel's home or seize any property from the residence, and did not assist in holding Doutel in custody. [*Id.* at 48-49]. While Plaintiff denies the Defendants' 56(a)(1) assertion that "Officer Reda and Lt. Materra played no role in this matter. They were members of the ESU unit and had been called into the area as an extra precaution," Plaintiff contends that "[b]oth Officer Reda and Lieutenant Materra play [sic] a role in the arrest of Mr. Doutel and they were present at the scene." [Dkt. 57-1, P's 56(a)(2) Stmt. ¶81; Dkt. 28, Ds' 56(a)(1) Stmt. ¶81].

Plaintiff, however, has failed to point to any piece of evidence in the record demonstrating that Officer Reda or Lieutenant Materra played any role in the search of the Doutel home or the seizure of Plaintiff's property, or that either performed any particular act constituting an element of or a basis for any claim alleged by the Plaintiff. As noted, "[a] party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are

required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.*, No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted).  Here, Mrs. Doutel relies only on the conclusory allegations in her complaint that Salley, Reda, and Materra were involved in the alleged violation of Plaintiff's Fourth Amendment rights, but has failed to substantiate this claim with even a scintilla of evidence in the record that would allow the Court or a jury to conclude that this allegation is true.  In fact, Plaintiff expressly admits that Officer Salley played no role in entering the Doutel home or in seizing property.  Moreover, Duane Doutel testified that only "two or three" officers entered his home and participated in the search and seizure.  [Dkt. 57-4, Duane Doutel Depo. p. 77].  This comports with the affirmations of Officers Zwickler, Curwen, and Fludd, who admit to having entered Doutel's home and participated in the seizure of the firearms, and with the affidavit of Sergeant Walsh, who affirms that he and Fludd discussed a plan to place Doutel's firearms in safekeeping.  [Dkt. 28-3, Fludd Aff. ¶¶13, 14; Dkt. 28-2, Curwen Aff. ¶¶13, 16; Dkt. 32, Zwickler Aff. ¶20; Dkt. 29-1, Walsh Aff. ¶22].  As there is no evidence in the record upon which a jury could properly find in favor of Plaintiff – who has the burden to present such evidence – as to Defendants Salley, Reda, and Materra, summary judgment is proper as to these Defendants in the absence of any evidence implicating them in a deprivation of Plaintiff's rights. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

Accordingly, Plaintiff's Fourth Amendment claim fails as to Defendants Salley, Reda, and Materra.

In sum, summary judgment in favor of defendants is DENIED as to Plaintiff's Fourth Amendment claim encapsulated in Count 1, but is GRANTED as to Defendants Reda, Salley, and Materra.

### b. Procedural Due Process Pursuant to the 14th Amendment

Defendants assert that the seizure of Barbara Doutel's firearms on February 16, 2011 does not constitute a deprivation of due process under the 14th Amendment because the Plaintiff was afforded a sufficient post-deprivation process by which to regain possession of her firearms and which she failed to utilize. Plaintiff, in contrast, contends that she was entitled to but not afforded pre-deprivation process by which she could retrieve her firearms, but was instead deprived of notice and a meaningful opportunity to be heard before she was divested of her property.[8]

The Fourteenth Amendment to the U.S. Constitution proclaims that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, Section 1. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or

---

[8] Although it is negligible whether Plaintiff has asserted a procedural due process claim in count 1 of her complaint, which asserts merely that the seven defendant officers, "acting under color of state law, seized the Plaintiff's property [ ] without a warrant," "failed to follow applicable laws and procedures," engaged in acts that were "objectively unreasonable," and "lacked legal grounds to enter the Plaintiff's home and seize her property," the Court nevertheless addresses this claim as the parties have briefed the issue in Defendant's motion for summary judgment and in Plaintiff's opposition. [Dkt. 1, Compl. ¶¶38-41].

'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*"  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original).  Further, "[t]he constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.  Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate."  *Id.* at 126.  Due process "is a flexible concept that varies with the particular situation."  *Id.* at 127.  The Supreme Court has articulated a three factor test to determine what procedural safeguards are necessary under the Constitution:

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.  "Applying this test, the Court usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property."  *Zinermon*, 494 U.S. at 127 (collecting cases; emphasis in original).  Further, "the availability of adequate pre-deprivation and post-

deprivation remedies under state law will defeat a § 1983 action brought against state actors . . . so long as the claimant had sufficient notice of such remedies, . . . i.e. such notice as is reasonably calculated to apprise a person of an action against him." *Rackley v. City of New York*, 186 F. Supp. 2d 466, 481 (S.D.N.Y. 2002).

However, the Supreme Court has noted that, "[i]n some circumstances . . . a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." *Zinermon*, 494 U.S. at 128.  In *Parratt v. Taylor*, 451 U.S. 527 (1981) *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986), the Supreme Court held that where a deprivation of property is "a result of a random and unauthorized act by a state employee," and "not a result of some established state procedure," an adequate post-deprivation state judicial remedy may satisfy procedural due process.[9]  *Id.* at 541.  The Court extended this holding in *Hudson v. Palmer*, 468 U.S. 517, 533 (1984), holding that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process

---

[9] The Supreme Court later rethought its *Parratt* ruling in *Daniels v. Williams*, 474 U.S. 327, 328 (1986), concluding that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."  In *Daniels*, petitioner sought "to recover damages for back and ankle injuries allegedly sustained when he fell on a prison stairway," on which he allegedly slipped on a pillow negligently left by a correctional deputy. Petitioner claimed that the deputy's negligence deprived petitioner of his "liberty" interest in freedom from bodily injury.  *Id.* at 328.  "Far from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person.  To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law."  *Id.* at 332.  The due process analysis articulated in *Parratt* and *Hudson* remains controlling, negligent acts excepted.

Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *See also Malapanis v. Regan*, 335 F. Supp. 2d 285, 292-93 (D. Conn. 2004) aff'd, 147 F. App'x 219 (2d Cir. 2005) (explaining *Parratt* and *Hudson*). The Second Circuit has more recently summarized and explained:

> in evaluating what process satisfies the Due Process Clause, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees. When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post-deprivation remedy. In contrast, when the deprivation is pursuant to an established state procedure, the state can predict when it will occur and is in the position to provide a pre-deprivation hearing. Under those circumstances, the availability of post-deprivation procedures will not, *ipso facto*, satisfy due process.

*Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (internal citations and quotation marks omitted). *See also G.I. Home Developing Corp. v. Weis*, 499 F. App'x 87 (2d Cir. 2012) (summarizing same); *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996) (same); *Sudler v. City of New York*, 08 CIV.11389 GBD AJP, 2010 WL 68095 (S.D.N.Y. Jan. 8, 2010) *report and recommendation adopted*, 08 CIV. 11389 GBDAJP, 2010 WL 726964 (S.D.N.Y. Feb. 19, 2010) (summarizing same); *Salatto v. City of Milford*, 3:08CV1071 MRK, 2012 WL 774612 (D. Conn. Mar. 7, 2012), *appeal dismissed* (July 2, 2012) ("Where a plaintiff's deprivation occurred as a result of an established state procedure, due process liability may attach when the plaintiff is denied pre-deprivation hearings. Where the acts are random and unauthorized, pre-deprivation hearings are not required, since the [government] cannot know

when such deprivations will occur.") (internal quotation marks and citations omitted).

Although the distinction between random and unauthorized conduct and state-authorized procedures is not "clear-cut," "acts of high-ranking officials who are ultimate decision-maker[s] and have final authority over significant matters, even if those acts are contrary to law, should not be considered random and unauthorized conduct for purposes of a procedural due process analysis." *Rivera-Powell*, 470 F.3d at 465 (internal citations and quotation marks omitted). "Furthermore, '[that] an individual employee himself is able to foresee a deprivation is simply of no consequence.  The controlling inquiry is solely whether the state is in a position to provide for predeprivation process.'" *Hellenic Am. Neighborhood Action Comm.*, 101 F.3d at 880 (citing *Hudson v. Palmer*, 468 U.S. at 534).

Here, the Plaintiff's claims are not based on established state procedures, but rather on random, unauthorized acts by municipal employees.  Plaintiff claims that because of a lack of training the officers acted pursuant to a rampant policy or practice dictating that they ignore the search and seizure requirements of the Fourth Amendment by seizing firearms without consent.  Plaintiff offers no evidence of such a policy or rampant practice.  On the other hand, the officers involved in the seizure of Mrs. Doutel's firearms have attested that there was no policy or practice of ignoring citizen's rights against unreasonable search and seizure.  On the contrary, they attested that they seized guns with the owner's consent when "passions may have been high and where deadly weapons were

**36**

involved" and placed them in safekeeping at the Norwalk Police Department. [Dkt. 29-1, Walsh Aff. ¶¶19, 20, 23; *see also* Dkt. 28-2, Curwen Aff. ¶11 "It was my understanding that our intention was at that time to remove the weapons that might be in the house from the property consensually and hold on to them for security and safety.  In my experience with the NPD this had often been accomplished for the benefit of all involved."].  Here, Plaintiff points to no evidence in the record demonstrating that the officers acted pursuant to any established state policy of seizing weapons *without consent* in the absence of a warrant.  At most, the Plaintiff has alleged that the officers who seized Mr. Doutel's firearms did so in a random and unauthorized act *in contravention* of the prior experience of the Norwalk Police Department.  Furthermore, Plaintiff does not argue that an ultimate decision-maker perpetrated the acts complained of such that those acts could not be considered as random or unauthorized. Therefore, the existence of an adequate post-deprivation state remedy may satisfy procedural due process, precluding Plaintiff from claiming that she is entitled to a pre-deprivation proceeding.

Plaintiff argues that no procedures were available to her by which she could regain possession of her property post-seizure; rather, she argues that procedures were available only to her husband Duane Doutel – the defendant in the underlying criminal case – thereby depriving the Plaintiff of her due process rights.  Plaintiff, however, is incorrect.  Connecticut statutes provide adequate post-deprivation procedures by which an owner (and non-criminal defendant)

may regain possession of property seized by the police.  Conn. Gen. Stat. § 54-36a(c) provides that:

> Unless such seized property is stolen property . . . or unless such seized property is adjudicated a nuisance . . . or unless the court finds that such property shall be forfeited or is contraband . . . it shall, at the final disposition of the criminal action or as soon thereafter as is practical, or, if there is no criminal action, at any time upon motion of the prosecuting official of such court, order the return of such property to its owner within six months upon proper claim therefor.

Conn. Gen. Stat. § 54-36a(c).  Thereafter, "[a]ny order made under the provisions of subsection[ ] [(c)], shall upon notification from the clerk, be complied with by the person or department having custody or possession of such property."  Conn. Gen. Stat. § 54-36a(h).  An "owner" is defined as "a person or persons entitled to seized property as a matter of law or fact."  Conn. Gen. Stat. § 54-36a(a)(3).  Use of this procedure is not limited to defendants in criminal proceedings, but rather by the plain meaning of the statute is available to any "owner" of seized property regardless of whether any criminal proceedings have been instituted against that owner.[10]  Barbara Doutel, then, was entitled to pursue the repossession of her property by following the procedures enunciated in Conn. Gen. Stat. § 54-36a.  Moreover, Plaintiff was entitled to bring a claim with the Connecticut Claims Commissioner pursuant to Conn. Gen. Stat. § 4-142 for

---

[10] The Court notes that this statute is also available for use by victims of crimes. Conn. Gen. Stat. §54-203 specifically provides that "Subject to the provisions of section 54-36a, the victim shall have the right to have any property the victim owns which was seized by police in connection with an arrest to be returned." Conn. Gen. Stat. §54-203(b)(7)(E).

any claim against the state, which would encompass a complaint for return of her allegedly unlawfully seized property.

Here, the Norwalk Police Department seized seven firearms – including two rifles, one SIG Sauer 380 caliber handgun and one SIG Sauer 9 mm handgun allegedly owned by the Plaintiff – contemporaneous with her husband Duane Doutel's arrest for threatening and all of which were noted as having been seized as evidence on the police report completed at the time of the incident.  Thus, regardless of whether Officer Zwickler now believes the firearms to have been erroneously coded as evidence, at the time the weapons were seized they were considered to be so by the court system and Mrs. Doutel's recourse was to request the return of her property from the prosecuting authority pursuant to Conn. Gen. Stat. § 54-36a(c).  There is no evidence in the record before the Court, however, that Plaintiff made any such request of the prosecuting authority. Rather, the record indicates that Mrs. Doutel had ample opportunity to avail herself of the procedures in place for the return of her property but failed to do so despite having actual knowledge that her firearms had been seized by the Norwalk Police Department.

The record indicates that on April 22, 2011, two months after his arrest, Duane Doutel filed a Motion for Return of Seized Property, requesting the return to *Mr. Doutel* of *all* property listed in Officer Zwickler's Case/Incident Report, including the firearms allegedly belonging to the Plaintiff.  [Dkt. 46-3, Duane Doutel 4/22/11 Motion for Return of Seized Property; Dkt. 28, Ds' 56(a)(1) Stmt. ¶61].  Plaintiff was neither mentioned in Mr. Doutel's motion, nor did Plaintiff at

that point request the return of her property from either the prosecuting authority or the court.  The court did not act on Mr. Doutel's motion.  On May 20, 2011 the State moved to modify Mr. Doutel's condition of release after the State's attorney learned that he had filed an application for a temporary pistol permit after his original pistol permit had been revoked and that his application had been denied. The court granted the State's motion and entered a temporary order that Mr. Doutel not possess any weapons or apply for a pistol permit due to his pending threatening charge.  There is no evidence in the record that Barbara Doutel requested a return of her property from the State's attorney (or thus from the court) from the time of the seizure to the time that the court entered the temporary order that Duane Doutel not possess any firearms.  On May 23, 2011 Mr. Doutel filed a motion to vacate the court's May 20 temporary order.  The Court denied Mr. Doutel's motion to vacate on November 28, 2011, noting that "[c]onsidering the weight of the evidence and the nature and totality of the circumstances in this case, the previous orders of the court, temporarily restricting the defendant's right to bear arms to ensure that the safety of any other person will not be endangered, are not unreasonable."  [Dkt. 45-4, 11/28/11 Memo. of Decision re Motion to Vacate Order].

Five days prior to the court's May 20, 2011 temporary order, Rachel Baird, counsel for both Mr. and Mrs. Doutel, authored and addressed two letters to Chief of Police Harry Rilling demanding the return of Mr. and Mrs. Doutel's respective firearms.  [Dkts. 47-4, 47-5, Letters re Return of Seized Property, 5/15/11; Dkt. 28, Ds' 56(a)(1) Stmt. ¶63].  The Norwalk Police Department, however, received these

**40**

letters on May 23, 2011, three days after the court had issued its temporary order prohibiting Mr. Doutel from possessing firearms.  Plaintiff does not contest that the Department received these letter requests *after* the court's temporary order. Further, on July 5, 2011, the court issued a protective order against Mr. Doutel, the issuance of which by law prohibited Mr. Doutel from possessing any firearms while the protective order was in place.  Nothing in the record indicates that the Plaintiff at any time during the pendency of her husband's criminal case made any request of the prosecuting authority that her property be returned to her.

Instead, the Plaintiff has only proffered evidence that she requested the return of her firearms *from the Norwalk Police Department*, an entity that could not release her weapons without an order from the Connecticut superior court in accord with the court's temporary and protective orders and with Conn. Gen. Stat. § 54-36a.  The seized property – which had been coded as evidence – was subject to the release requirements set forth in Conn. Gen. Stat. § 54-36a(c), which specifically provides that seized property may be released upon the termination of criminal proceedings or by order of the court pursuant to a motion made by the aggrieved party to the prosecuting authority.  Finally, on April 17, 2012 counsel for the City of Norwalk filed with the superior court a Motion for Disposition of Seized Property, seeking the court's intercession in determining the ownership and disposition of weapons allegedly owned by Barbara Doutel. Although the Motion was mentioned at a May 7, 2012 hearing with the court, the court failed to rule on this motion before the termination of Duane Doutel's case in July 2012, at which time a magistrate judge signed an Order requiring the

release of the property held by the Norwalk Police Department.  [Dkt. 47-2, Inventory of Property Seized Without a Search Warrant, and Order of the Court 7/31/12, p.2; Dkt. 28, Ds' 56(a)(1) Stmt. ¶76].  The record indicates that the seized items were returned to Barbara and Duane Doutel on August 1 and September 24, 2012.

Accordingly, because Connecticut provides an adequate post-deprivation judicial remedy available to the Plaintiff for redress of the seizure of her property in Conn. Gen. Stat. § 54-36a, the Court GRANTS summary judgment in favor of Defendants on Plaintiff's procedural due process claim contained in count 1 of her complaint.  *See S. v. Webb*, 602 F. Supp. 2d 374, 386-387 (D. Conn. 2009) *abrogated on other grounds by McDonald v. City of Chicago*, ––– U.S. –––, 130 S. Ct. 3020 (2010) (dismissing due process claim where police officer allegedly improperly seized firearm and where "Connecticut provides an adequate post-deprivation remedy" pursuant to Conn. Gen. Stats. §§ 54-33f, 54-36a(c), and 4-142 (may assert claim with Claims Commissioner));  *Malapanis v. Regan*, 335 F. Supp. 2d 285 (D. Conn. 2004) aff'd, 147 F. App'x 219 (2d Cir. 2005) (search and seizure of computers and technology equipment pursuant to search warrant alleged by plaintiff to be false and incident to civil action instituted by State for breach of contract did not violate due process, and where state post-deprivation procedures under Conn. Gen. Stats. §§ 54-33f, 54-36a(c), and 4-142 were adequate); *Salatto v. City of Milford*, 3:08CV1071 MRK, 2012 WL 774612 (D. Conn. Mar. 7, 2012), *appeal dismissed* (July 2, 2012) (due process not violated where plaintiff was required to pay towing fees before the City of Milford would release

his vehicle, and where he could have but failed to seek "relief by filing a motion in state court before paying the fee" pursuant to Conn. Gen. Stat. § 54-36a or by filing a civil action in state court or with Claims Commissioner); *Crisanti v. Dumas*, 3:02CV1544 (RNC), 2004 WL 178606, at * 1 (D. Conn. Jan. 22, 2004) (where state police and Dept. of Public Service seized plaintiff's motorcycle and failed to return it despite a court order to do so, court dismissed complaint and held that: "Connecticut law provides remedies for people complaining of unauthorized deprivations of property by state officials; they can file suit in state court or, if that is not possible, they can file a claim with the Claims Commissioner. . . . Nothing in plaintiff's papers suggests that he has tried either of these alternatives").  S*ee also Viteritti v. Inc. Vill. of Bayville*, 10 CV 3283 DRH ARL, 2013 WL 145811 (E.D.N.Y. Jan. 14, 2013) (plaintiffs were not entitled to pre-deprivation hearing and the town had not violated due process where town removed plaintiffs' lawn, shrubbery, and irrigation system and paved a road across their property and where plaintiffs had access to post-deprivation Article 78 proceeding under New York law to address deprivation of property).

c.  <u>Municipal liability based on a failure to train (Count 2)</u>

Defendants argue that Barbara Doutel has failed state a claim on which relief may be granted as to her municipal liability claim for alleged constitutional violations pursuant to *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), and urges the Court to dismiss Count 2 of Plaintiff's complaint or, in the alternative, grant judgment in their favor on the pleadings.  Plaintiff counters that she has made out a *Monell* claim for violations of the Second, Fourth, and Fourteenth

Amendments, as "but for the Defendant's [sic] lack of a clear policy setting forth the training of their officers on the exceptions to the search warrant requirements, the officer's [sic] would have known not to enter the Plaintiff's residence as no exception to the search warrant requirement was met."  [Dkt. 57, P's Opp. to MSJ p. 15].  Plaintiff contends that "[t]he lack of a substantive policy and deficiency in the current policy can be shown by the number of police officer's [sic] who believed the search and seizure of the Plaintiff's property was conducted lawfully," and thus it can be "reasonably concluded if multiple officer's [sic] are under a similar understanding than [sic] the department as a whole is under the same said understanding."  [*Id*. at 15-16].

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Monell*, 436 U.S. at 694.  "In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell*, 436 U.S. at 690-91).  The fifth element, requiring an official policy, "can only be satisfied where a plaintiff proves that a 'municipal policy of some nature caused a constitutional tort.'"  *Id*. (citing *Monell*, 436 U.S. at 691); *see also Ochoa v. City of West Haven*, 2011 WL 3267705, at *8 (D. Conn. July 29, 2011) (quoting same).  A municipality may be "held liable if a plaintiff proves the municipality violated a federally protected right through (1) municipal policy, (2) municipal custom or

**44**

practice, or (3) the decision of a municipal policymaker with final policymaking authority." *Zherka v. DiFiore*, 412 F. App'x 345, 348 (2d Cir. 2011) (citing *Monell*, 436 U.S. at 695).

A plaintiff may overcome a motion for judgment on the pleadings by asserting facts which if proved "establish municipal liability by showing that a municipal policy or custom existed as a result of the municipality's deliberate indifference to the violation of constitutional rights, either by inadequate training or supervision." *Russo v. City of Hartford*, 341 F. Supp. 2d 85, 107 (D. Conn. 2004). "A municipal policy may be pronounced or tacit and reflected in either action or inaction. In the latter respect, a city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (internal quotation marks and citations omitted). Failures to act – such as failures to train or supervise subordinates – "may also evince municipal policy where municipal decisionmakers continue to adhere 'to an approach that they know or should know has failed to prevent' constitutional violations." *Davis v. City of New York*, 75 F. App'x 827, 829 (2d Cir. Sept. 22, 2003). "Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied." *City of Canton v. Harris*, 489 U.S. 378, 396 (1989). "[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates,

such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (internal quotation marks omitted).  A plaintiff must demonstrate that, "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).

"As the Supreme Court has cautioned, 'deliberate indifference' is 'a stringent standard of fault' and … necessarily depends on a careful assessment of the facts at issue in a particular case." *Cash*, 654 F.3d at 334 (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011)).  The Second Circuit has instructed that the "operative inquiry is whether those facts demonstrate that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'" *Id.* (citations omitted).  Deliberate indifference then "may be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,' but the policy maker 'fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs.'" *Id.* (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) and *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)).  In addition, a plaintiff must prove that "'action pursuant to official municipal policy' caused the alleged constitutional injury." *Cash*, 654 F.3d at 333 (quoting *Connick*, 131 S. Ct. at 1359).

A claim for failure to train "will trigger municipal liability only where the failure to train amounts to the deliberate indifference to the rights of those with whom the state officials will come into contact."  *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998) (internal quotation marks and citation omitted).  The Second Circuit has outlined "three showings required to support a claim that a municipality's failure to train amounted to 'deliberate indifference' to the rights of citizens."  *Id.* at 903-904.  Therefore to establish a claim of inadequate training, Plaintiffs mush show that (1) "a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation"; (2) that the "situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) that "the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights."  *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992) (citations omitted).  Thus a municipality "cannot be liable if the need for such training was not obvious."  *Russo*, 341 F. Supp. 2d at 109 (citing *Vann*, 72 F.3d at 1049).  "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."  *Vann*, 72 F.3d at 1049.  In addition, "a pattern of misconduct, while perhaps suggestive of inadequate training, is not enough to create a triable issue of fact on a failure-to-train theory.  The plaintiff must offer evidence to support the conclusion that the training program was inadequate, not

[t]hat a particular officer may be unsatisfactorily trained or that an otherwise sound program has occasionally been negligently administered, and that a hypothetically well-trained officer would have avoided the constitutional violation." *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 440-41 (2d Cir. 2009) (internal quotation marks and citations omitted).  In short, there must be a systemic deficiency of which the municipality is or should be aware and fails to address.

Plaintiff's allegations of municipal liability are wholly conclusory; the record is entirely devoid of any particularized facts from which the Court or the trier of fact could conclude that the Norwalk Police Department failed to train its officers in the exceptions to the warrant requirement under the Fourth Amendment (or in any other constitutional violation).  Plaintiff has alleged no facts – specific or otherwise – which support an inference of deliberate indifference to the rights of citizens through a failure to train or a failure to supervise as required by the precedent cited above.  Indeed, the Plaintiff alleges only vaguely that "[t]hrough the facts and exhibits presented in this case, it is the usual custom and policy of the NPD to search and seize property in accord with its deficient understanding of the search and seizure laws."  [Dkt. 57, P's Opp. to MSJ p. 16].  Plaintiff has failed completely, however, to articulate *what* deficient understanding the Defendants allegedly had, *how* this deficient understanding led to the events at issue in this case, or *how* a hypothetically well-trained officer would have avoided these alleged constitutional violations.   Indeed, the Plaintiff has not cited to *any* exhibits or documentation in the record to support her

theory.  Rather, as noted above, Plaintiff contends that "[t]he lack of a substantive policy and deficiency in the current policy can be shown by the number of police officer's [sic] who believed the search and seizure of the Plaintiff's property was conducted lawfully."  Fatally, though, Plaintiff offers no support for this conclusion in the way of numbers or statistics, cites to no evidence in the record, and fails to acknowledge the various Officers' affirmations that they believed the search to be lawful because they believed Mr. Doutel to have consented to both the search and seizure which, on its face and without Plaintiff demonstrating any evidence in the record to the contrary, indicates that the officers knew that they needed Mr. Doutel's consent to search his home and seize his weapons without a warrant, even if they were mistaken about the level of consent ultimately given.  *See* Officer Affirmations, discussed *supra* at Part IV.a.  Further, seven officers responded to the Doutel residence on February 16, 2011.  Of them, the record indicates that only four were involved in the seizure of Plaintiff's weapons.  The Plaintiff has cited to no evidence in the record that these four officers are representative of the alleged lack of training of the entire Norwalk police force.

Plaintiff has also failed to identify any facts demonstrating that the need for training was obvious.  She provides no proof in the record of repeated complaints of similar civil rights violations followed by a failure on the City's part to meaningfully attempt to investigate such incidents as required to state a claim for failure to train under Second Circuit law.  See *Russo*, 341 F. Supp. 2d at 109; *Vann*, 72 F.3d at 1049.  Indeed, Plaintiff has failed to alleged that any "other

49

similar claims of misconduct brought by other citizens" even exist aside from the claim brought by Mrs. Doutel.  As the Supreme Court has held, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Bd. of Cnty. Comm'rs*, 520 U.S. at 409.  Plaintiff similarly fails to support her *Monell* claim by providing examples of the City's alleged awareness.  Absent any evidence of a pattern of similar violations to provide "notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Connick*, 131 S.Ct. at 1360.

Plaintiff's municipal liability claim is wholly conclusory and must fail at either the motion to dismiss or the summary judgment stage.  *See Santos v. New York City*, 847 F. Supp. 2d 573, 577 (S.D.N.Y. 2012) (motion to dismiss granted "[b]ecause the existence of a municipal policy or practice, such as a failure to train or supervise, cannot be grounded solely on the conclusory assertions of the plaintiff").  Accordingly, Plaintiff's second count alleging municipal liability is DISMISSED in its entirety.

### d.  2nd Amendment Right to Keep and Bear Arms  (Count 3)

The Plaintiff alleges that the seizure of her firearms and their subsequent holding by the Norwalk Police Department constitutes a violation of her Second Amendment right to keep and bear arms.  The Defendants counter that, while the Plaintiff's specific firearms were seized, her *right* to bear arms was not infringed.

The Second Amendment to the United States Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend II.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment conferred an individual right to keep and bear arms for self-defense.  554 U.S. at 595, 602 ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms.  Of course the right was not unlimited, just as the First Amendment's right of free speech was not.").  Two years after its ruling in *Heller*, the Supreme Court held for the first time in *McDonald v. City of Chicago*, –––– U.S. ––––, 130 S. Ct. 3020 (2010) that "the Second Amendment right recognized in *Heller* " was applicable to the states by incorporation into the Due Process Clause of the Fourteenth Amendment.  *Id.* at 3026.

While this recent jurisprudence has squarely conferred a private right of action under the Second Amendment, the contours of such a right are as of yet underdeveloped and ill-defined, thus necessitating that this Court grant qualified immunity to the defendant officers in this action.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted); *Tracy v. Freshwater*, 623 F.3d 90, 95-96 (2d Cir. 2010) (holding same).  "Qualified immunity balances two important interests—the need

**51**

to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal citation and quotation marks omitted).

"[W]hen a defendant official invokes qualified immunity as a defense in order to support a motion for summary judgment, a court must consider two questions: (1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Tracy*, 623 F.3d at 96.  It is within the sound discretion of a federal court to analyze the two qualified immunity factors in the order of its choosing, in light of the circumstances of the case at hand.  *Pearson*, 555 U.S. at 236.

As to the "clearly established" prong of this analysis, "[t]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (overturned on other grounds) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Further, "the objective reasonableness test is met – and the defendant is entitled to immunity – if officers of reasonable competence could disagree on the legality of the defendant's actions."  *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995)

(internal quotation marks and citation omitted); *Crowell v. Kirkpatrick*, 400 F. App'x 592, 594 (2d Cir. 2010) ("even if the right at issue was clearly established in certain respects, ... an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context.").  In other words, "[t]he principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law.  Police officers are entitled to rely on existing lower court cases without facing personal liability for their actions." *Pearson*, 555 U.S. at 244-45.

The general right to keep and bear arms under the Second Amendment is clearly established in light of the recent Supreme Court holdings in *Heller* and *McDonald*.  Thus, the issue in this case is whether it was objectively reasonable for the defendant officers to believe that their particular actions did not violate Mrs. Doutel's right to keep and bear arms.  The Court finds that it was.  Case law based on circumstances analogous to those in this case is sparse in this circuit. The few cases that do exist in the Second Circuit, though, recognize that "the 'right to bear arms' is not a right to hold some particular gun."  *Garcha v. City of Beacon*, 351 F. Supp. 2d 213, 217 (S.D.N.Y. 2005).

In *Garcha*, a case predating both *Heller* and *McDonald*, the plaintiff alleged a violation of his Second Amendment right to bear arms where his firearm was seized incident to his arrest for criminal mischief, disorderly conduct, and harassment.  The plaintiff attempted to regain possession of his pistol but the City failed to return it to him, and it was later destroyed by order of the City court.

**53**

351 F. Supp. 2d at 217.  The district court determined that the City had not

violated the plaintiff's Second Amendment right to bear arms, holding that

> [a]t worst, the City converted a single gun belonging to
> defendant, by causing its destruction.  This does not
> state any claim under the Second Amendment, since
> defendant has not been prevented from 'bearing arms.'
> It is true that he cannot bear the weapon that was
> destroyed, because it no longer exists.  But the 'right to
> bear arms' is not a right to hold some particular gun.
> Nothing in plaintiff's pleading or other papers suggests
> that any action taken by defendants would prevent him
> from acquiring another weapon.

[*Id.* at 217].

Several cases in this circuit have followed *Garcha*'s reasoning post-*Heller*

and *McDonald* and have held that where a plaintiff's ability to acquire *other*

firearms has not been abridged, a Second Amendment violation has not occurred

even despite a seizure of a plaintiff's *particular* firearm.  *See Vaher v. Town of*

*Orangetown, N.Y.*, 10 CIV. 1606 ER, 2013 WL 42415, at *17 (S.D.N.Y. Jan. 2, 2013)

("[T]here is no allegation that Defendants' actions have affected Plaintiff's ability

to retain or acquire other firearms or ammunition, and no law has been cited that

infringes on Plaintiff's right to obtain other firearms.  Accordingly, the conduct

alleged in the Amended Complaint does not amount to a Second Amendment

violation" where police searched plaintiff's residence pursuant to a warrant,

seized firearm allegedly not covered by warrant, plaintiff was never arrested, and

firearm was never returned.); *McGuire v. Vill. of Tarrytown*, 08 CIV. 2049 KTD;

2011 WL 2623466 (S.D.N.Y. June 22, 2011) *recon. dismissed*, 08 CIV. 2049 KTD,

2011 WL 4347175 (S.D.N.Y. Sept. 14, 2011) (granting motion for summary

judgment in favor of defendant on plaintiff's Second Amendment claim based on seizure of handgun pursuant to court's temporary order of protection and noting *Garcha*'s determination that where plaintiff was not prevented from acquiring another weapon no Second Amendment violation could have occurred).  *See also Walters v. Wolf*, 660 F.3d 307, 317-18 (8th Cir. 2011) (no Second Amendment violation where police seized firearm pursuant to arrest for domestic dispute and with plaintiff's permission, and where plaintiff was not able to regain possession of firearm at resolution of criminal charges because city had destroyed it pursuant to a city court order, as "defendants did not prohibit Walters from retaining or acquiring other firearms.").

Absent authority in this circuit reversing the holdings in *Garcha*, *McGuire*, and *Vaher*, the Defendants in this action are entitled to rely on the holdings of those cases.  *Pearson*, 555 U.S. at 244-45.  In light of this line of case law, it was objectively reasonable for the defendant Norwalk Police officers to believe that their seizure of the firearms in the Doutel household did not violate Mrs. Doutel's right to keep and bear arms, as the seizure of these arms did not prevent Mrs. Doutel from acquiring other weapons.  In other words, it was reasonable for the officers to believe that Mrs. Doutel's interest in her *particular* weapons did not rise to a Second Amendment violation of her right to bear arms where her *general* right to keep and bear arms remained intact.  In the absence of controlling authority recognizing a Second Amendment violation in similar circumstances for the seizure by law enforcement officials of a particular firearm, and in light of the scarcity of applicable Second Amendment case precedent in this circuit, the

Defendants are entitled to qualified immunity as to Barbara Doutel's Second Amendment claim.  Accordingly, summary judgment is GRANTED in favor of Defendants as to Count 3 of Plaintiff's complaint.

### e.  Connecticut Constitution, Article First, section 15 (Count 4)

Mrs. Doutel alleges in her last count that Defendants violated her state constitutional right to bear arms under Article First, section 15 of the Connecticut constitution, which provides that "[e]very citizen has the right to bear arms in defense of himself and the state."  Conn. Const. art. I, § 15.  Neither the Connecticut appellate nor the Connecticut Supreme Court, however, has opined as to whether Article 1, § 15 creates a private right of action.  Therefore, this Court declines to create one.

In *Binette v. Sabo*, 244 Conn. 23 (Conn. 1998), the Connecticut Supreme Court recognized a narrow cause of action for money damages under Article First, §§ 7 and 9 of the Connecticut constitution for illegal searches and seizures of private residences by law enforcement officers acting without a warrant, drawing from the federal equivalent of a *Bivens* action under the Fourth Amendment to the U.S. Constitution.  *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971) (a violation of one's Fourth Amendment right to be free from unreasonable searches and seizures "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct.").  In creating a private right of action under sections 7 and 9, though, the Connecticut Supreme

Court emphasized that its "decision to recognize a *Bivens*-type remedy in this case does not mean that a constitutional cause of action exists for every violation of our state constitution."  244 Conn. at 47.  The Court further instructed that

> [w]hether to recognize a cause of action for alleged violations of other state constitutional provisions in the future must be determined on a case-by-case basis.  As in the present case, that determination will be based upon a multifactor analysis.  The factors to be considered include: the nature of the constitutional provision at issue; the nature of the purported unconstitutional conduct; the nature of the harm; separation of powers considerations and the other factors articulated in *Bivens* and its progeny; the concerns expressed in *Kelley Property Development, Inc.*; and any other pertinent factors brought to light by future litigation.

*Id.* at 48.  *See also Kelley Prop. Dev., Inc. v. Town of Lebanon*, 226 Conn. 314, 340 (Conn. 1993).

Since *Binette*, Connecticut courts have rejected numerous constitutional tort claims under various sections of the state constitution.  *See, e.g., Torres v. Armstrong*, CV990427057S, 2001 WL 1178581 (Conn. Super. Ct. Sept. 6, 2001) (refusing to recognize private cause of action under Article First, §§ 1, 4, 8, 9, 14, 20 in case brought by prisoner); *Prigge v. Ragalia*, X06CV010167912S, 2003 WL 23177403, at *3-4 (Conn. Super. Ct. Dec. 18, 2003) (refusing to recognize cause of action under Article First, §§ 3 and 20 due to availability of statutory remedy); *Best v. D'Amario-Rossi*, CV990334718S, 2003 WL 138521 (Conn. Super. Ct. Jan. 2, 2003) (refusing to recognize cause of action under Article First, § 8 where state Supreme Court had not authorized such); *Boudreau v. City of Middletown*, No. CV 970083396S, 1998 WL 321858, at *3 (Conn. Super. Ct. June 9, 1998) (refusing to

recognize a viable cause of action under Article First, §§ 1, 8 and 20); *Aselton v. East Hartford*, No. X07CV010079187S, 2002 WL 31875443, at *6 -*7 (Conn. Super. Ct. Dec. 3, 2002) (declining to recognize a damages claim against a municipality pursuant to Article First, §§ 4, 7, 8, 9, and 14).

Plaintiff cites to and this Court can find no authority, however, to support the creation of a private right to monetary relief under Article First, section 15.  In the absence of Connecticut appellate or Supreme court authority addressing whether a private right of action exists under section 15, this Court declines to either extend the holding in *Binette* to create one or to posit an opinion on a matter that is within the sound jurisdiction of the state courts to determine in the first instance.  The Second Circuit has held that "[a]lthough the doctrine of pendent jurisdiction is one of flexibility and discretion, it is fundamental that '[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.'"  *Young v. New York City Transit Auth.*, 903 F.2d 146, 163-64 (2d Cir. 1990) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)).  "A district court ought not reach out for [] issues, thereby depriving state courts of opportunities to develop and apply state law."  *Young*, 903 F.2d at 164.  Pendent jurisdiction is a matter of discretion, not of right, and a federal court need not exercise supplemental jurisdiction in every instance.  *See United Mine Workers*, 383 U.S. at 726.  A federal court may decline to exercise supplemental jurisdiction "when state law issues would predominate the litigation or the federal court would be required to interpret state law in the

absence of state precedent."  *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 166 (D. Conn. 2005).

Here, it is appropriate to decline supplemental jurisdiction where this Court would be forced to interpret Connecticut constitutional law in the absence of any state court precedent regarding whether a private right of action exists under Article First, section 15.  *See Lopez v. Smiley*, 375 F. Supp. 2d 19, 23-26 (D. Conn. 2005) (MRK) (declining to exercise supplemental jurisdiction over state constitutional claims that were novel, complex, and underdeveloped under state law and sought to extend the holding in *Binette*, and where plaintiff argued that private right of action existed; "federalism and comity concerns strongly suggest that recognition of new state constitutional torts should be determined on a case-by-case basis by Connecticut courts in the first instance"); *M.A. v. City of Torrington*, 3:10CV1890 JBA, 2012 WL 3985166, at *4 (D. Conn. Sept. 10, 2012) ("the Court declines to exercise supplemental jurisdiction over Plaintiffs' constitutional claims, leaving any such recognition of new state constitutional torts [under Article First, § 20] to Connecticut courts, based on the case-by-case approach of *Binette* and on considerations of federal-state comity").  *See also Walczyk v. Rio*, 339 F. Supp. 2d 385, 390-91 (D. Conn. 2004) aff'd in part, rev'd in part and remanded on other grounds, 496 F.3d 139 (2d Cir. 2007) ("No Connecticut appellate court has recognized a private cause of action under [Article First, § 15] and I decline to do so.").  This Court is persuaded by the precedent cited above and also declines to wade into the uncharted waters of private rights of action under the Connecticut constitution.

**V.**     <u>**Conclusion**</u>

**For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part.  Specifically, summary judgment is GRANTED on counts 2 and 3, alleging municipal liability and a violation of the Second Amendment, and is GRANTED as to Plaintiff's procedural due process claim alleged in count 1.  The Court declines to exercise supplemental jurisdiction over Plaintiff's claim for violations of the Connecticut constitution in count 4.  Summary judgment on Plaintiff's Fourth Amendment claim for unreasonable search and seizure in count 1 is DENIED and remains extant for trial as to defendants Walsh, Zwickler, Curwen, and Fludd only.**

**IT IS SO ORDERED.**

_____/s/_____
**Hon. Vanessa L. Bryant
United States District Judge**

**Dated at Hartford, Connecticut: July 3, 2013**